IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| MARY CRUMPTON, individually and on behalf of all others similarly situated,<br><br>        *Plaintiff*,<br><br>   v.<br><br>HAEMONETICS CORPORATION, a Massachusetts corporation,<br><br>        *Defendant*. | Case No.: 1: :21-cv-1402<br><br>Judge Rebecca R. Pallmeyer<br><br>Magistrate Judge Jeffrey T. Gilbert |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

    Plaintiff brought this case seeking redress for Haemonetics' unlawful collection and storage of her fingerprint when she donated plasma at an Octapharma donation center in Aurora, Illinois. Rather than respond on the merits, Haemonetics claims that it's not subject to this Court's jurisdiction.

    In its motion, Haemonetics paints itself as a mere technology provider to its plasma donation center customers that has no idea where its customers like Octapharma will use its products and zero connections to Illinois itself. (Def.'s Br. at 1–3, 8, 9.) But limited jurisdictional discovery has demonstrated the opposite: Haemonetics ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████ Haemonetics sends its employees to Octapharma facilities in Illinois,█ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

1

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. As explained below and as the Supreme Court has recently made clear, these contacts are more than sufficient to demonstrate that Haemonetics "purposefully avail[ed] itself of the privilege of conducting" its plasma business in Illinois, and are sufficiently related to Plaintiff's suit for this Court to exercise specific jurisdiction. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021).

## BACKGROUND

Haemonetics Corporation ("Haemonetics") provides a number of different software and hardware services to customers handling blood and plasma and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (Dep. Tr. of Alexander Steffan, attached as Ex. 1, at 11:5–12:3.) As part of Haemonetics' plasma business, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (*Id.* at 62:3–16.)



From June 2017 to August 2018, Plaintiff Crumpton donated plasma at an Octapharma facility in Aurora, Illinois ("Octapharma Aurora") (Compl. ¶ 28)—▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (Ex. 1 at 61:6–62:16.) Ms. Crumpton also worked at Octapharma Aurora as a phlebotomist from April 2018 to August 2018. (Declaration of Mary Crumpton, attached as Ex. 2, at ¶ 2.) On Ms. Crumpton's first visit to Octapharma Aurora, before she could be hooked up to a Haemonetics plasma collection device to donate, Ms. Crumpton was required

to complete a screening interview on a kiosk running Haemonetics' eQue donor management software. (Compl. ¶¶ 29–30.) At the conclusion of the screening interview, the eQue software prompted Ms. Crumpton to scan her fingerprint on a finger scanner, and she proceeded to donate plasma. (*Id.*) Each time Ms. Crumpton came back to donate plasma, she was again required to scan her fingerprint into eQue to identify herself. (*Id.* ¶ 32.) Unbeknownst to Plaintiff, each time she scanned her fingerprint before donating plasma, the eQue software automatically sent her fingerprint to Haemonetics to be stored on Haemonetics' server. (*Id.* ¶ 31.) Plaintiff's complaint alleges that at no point throughout the initial eQue screening interview, during any subsequent plasma donation, or at any other time did Haemonetics (i) inform Ms. Crumpton that Haemonetics was collecting and storing her fingerprint, (ii) obtain a written release from her to do so, or (iii) establish a retention policy or deletion schedule for her fingerprint. (*Id.* ¶¶ 32–35.) As a result, Ms. Crumpton brought this action alleging that Haemonetics violated her rights under the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.* Haemonetics now moves under Rule 12(b)(2) to dismiss for lack of personal jurisdiction. (Dkt. 10.)

## LEGAL STANDARD

When ruling on a Rule 12(b)(2) motion to dismiss based on the parties' submission of written materials, as here, the plaintiff "need only make out a *prima facie* case of personal jurisdiction." *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). If any factual disputes arise between the parties' submitted written materials, they must be resolved in the plaintiff's favor. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997). Finally, when analyzing a Rule 12(b)(2) motion, the court must accept all uncontroverted facts alleged in the complaint as true. *Mutnick v. Clearview AI, Inc.*, 2020 WL 4676667, at *1 (N.D. Ill. Aug. 12, 2020).

# ARGUMENT

To establish specific jurisdiction, a plaintiff need only show that (i) the defendant has "purposefully availed [itself] of the privilege of conducting business in that state," (ii) her suit arises out of or relates to the defendant's contacts with the forum, and (iii) it would not offend "traditional notions of fair play and substantial justice" for the defendant to litigate in the forum. *Greene v. Karpeles*, 2019 WL 1125796, at *5 (N.D. Ill. Mar. 12, 2019). Ultimately, the key inquiry is whether "the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

Here, as evidenced by the jurisdictional discovery produced in this case, attached hereto as Exhibits 1–11, Haemonetics has extensive contacts with Illinois, those contacts relate to Plaintiff's suit, and it is reasonable to require Haemonetics to litigate in Illinois.

## I. Haemonetics has extensive contacts with Illinois, all of which relate to Plaintiff's suit.

A defendant's minimum contacts with the forum state can take many different forms, including, for example, a defendant "exploiting a market in the forum State[,] entering a contractual relationship centered there," sending employees to the forum state to do business, shipping products to the forum state, and having physical offices in the state. *Ford Motor*, 141 S. Ct. at 1025; *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Such contacts are "purposeful" for purposes of specific jurisdiction so long as they are not "random, isolated, or fortuitous." *Ford Motor*, 141 S. Ct. at 1025 (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774, (1984)). In considering a defendant's contacts, courts must examine the "nature, quality, and quantity of the contacts, as well as their relation to the forum state." *uBID Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 431 n.3 (7th Cir. 2010). After establishing a defendant's minimum contacts with the forum

state, the plaintiff need only show that her suit sufficiently "relates to" those contacts to make out a *prima facie* case of specific jurisdiction. *Ford Motor*, 141 S. Ct. at 1026.

    A.    **The eQue Master Agreement was** ███████████████████
███████████████████████████████████████████████████████████

At the center of Haemonetics' relationship with Octapharma is the eQue Master Software Licensing & Hosting Agreement (the "eQue Master Agreement," attached as Ex. 3), which governs ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████. (*See* Compl. ¶¶ 1, 21–23.) The eQue Master Agreement was █████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████████. *See Burger King*, 471 U.S. at 479 (establishing minimum contacts entails looking at "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing"). Specifically, the eQue Master Agreement was ████████████
███████████████████████████████████████████████████████████
█████████████████████████████████████████████ (Ex. 3 at HAE 000095.) The agreement was █████████████████████████████████████
███████████████████████████████████████████████████████████
███████ (Ex. 1 at 35:21–36:4; Ex. 4 at CRUMPTON-HAE_000220.) The eQue Master Agreement was amended a number of times, but it is the very same agreement under which Haemonetics collected Ms. Crumpton's, and the class's, biometric data. (*See* Ex. 5 at HAE 000293 ¶ 3 (██████████████████████████████████████████████████
████████████████████████████████████); Ex. 6 at CRUMPTON-HAE_000309 (transition from eQue to NexLynk DMS completed on July 30, 2019).) In fact, █████████████████

5

███████████████████████████████████████. (Ex. 7 at HAE 000233;

Ex. 4 at CRUMPTON-HAE_000220.) Not only was ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████. (Ex. 7 at HAE 000234–35.)

It should be difficult for Haemonetics to minimize a contact in Illinois that is this significant. *Triad Cap. Mgmt., LLC v. Priv. Equity Cap. Corp.*, 2008 WL 4104357, at *5 (N.D. Ill. Aug. 25, 2008) (denying Rule 12(b)(2) motion where relevant contract "was to be executed and performed in Illinois"); *Nat'l Tech., Inc. v. Repcentric Sols.*, 2013 WL 3755052, at *4 (N.D. Ill. July 16, 2013) (finding that the execution of the relevant contract in Illinois is a "commonly considered" factor supporting jurisdiction). Given that Haemonetics does not admit the existence of this contract in its motion and will only address it on reply, Plaintiff must anticipate that Haemonetics will argue that the contract is somehow too old to be relevant. But for purposes of specific jurisdiction, a court may consider any forum-related contacts prior to the accrual of plaintiff's cause of action, so long as they remain relevant to the plaintiff's cause of action. *See United Phosphorus, Ltd. v. Angus Chem. Co.*, 43 F. Supp. 2d 904, 908 (N.D. Ill. 1999) (stating that "only conduct prior to the accrual of the cause of action or, at the very latest, the filing of the lawsuit is relevant."). Thus, the question is whether Haemonetics' contact with the state remained relevant to Plaintiff's cause of action. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████. (Ex. 1 at 42:18–44:6; 63:14–65:19; 75:22–76:5.)

**B.     Haemonetics knowingly receives fingerprint data from Illinois pursuant to its purposeful efforts to contract with Octapharma.**

Haemonetics would like to paint itself as completely agnostic as to where its customers are. But Haemonetics knows—and has known, for the better part of a decade—that it has ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Ex. 1 at 29:1–6; 61:6–62:16.) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Haemonetics not only knew that it was collecting biometric data from Illinoisans, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (*Id.* at 67:18–68:9; 73:16–74:13; Ex. 3 at HAE 000100–101; Ex. 9.) The fact that Haemonetics claims it does not particularly care where it collects biometric data from does not mean that this contact is irrelevant for the jurisdictional analysis—instead, courts look to whether a company has purposefully availed itself of a forum state, regardless of whether it has also purposefully availed itself of many other forum states. *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 758 (7th Cir. 2010) ("Hemi expressly elected to do business with the residents of forty-nine states. Although listing all forty-nine states by name would have made a stronger case for jurisdiction in this case … the net result is the same—Hemi stood ready and willing to do business with Illinois residents. And Hemi, in fact, knowingly did do business with Illinois residents. In light of this, Hemi's argument that it did not purposefully avail itself of doing business in Illinois rings particularly hollow."); *Greene v. Mizuho Bank, Ltd.*, 169 F. Supp. 3d 855, 863 (N.D. Ill. 2016) (Feinerman, J.) ("The court has no doubt that Mizuho did not *care* that Lack resided in California as opposed to, say, Nebraska or North Carolina. That does not change the fact that Mizuho created the necessary relationship with California by accepting Lack's deposit, knowing that it arrived from a California [bank] branch and a California resident, and profiting from the associated fees."). Haemonetics cannot knowingly and purposefully do substantial business in Illinois for over a decade—part of which

7

involved collecting Illinoisans' biometric data—and then insist that it has nothing to do with the State for jurisdictional purposes.

C. **Haemonetics earned revenue** ███████████████████████

███████████████████████████████████████████

███████████████████████. The eQue Master Agreement was designed so that Haemonetics ███

███████████████████████████████████████

███████████████████████████████████████

████. (Ex. 3 at HAE 000110; Ex. 1 at 93:3–96:13, 103:4–23.) There is nothing "random, isolated or fortuitous" about Haemonetics (i) ███████████████████████

███████████████████████, and (ii) ███████████

███████████████████████████████. *See Greene*, 169 F. Supp. 3d at 863 (exercising jurisdiction where defendant knew plaintiff's deposit came from the forum state, and defendant profited from the associated fees); *Maljack Prods., Inc. v. Survival Anglia Ltd.*, 1999 WL 182154, at *2 (N.D. Ill. Mar. 24, 1999) (finding that defendant's admission that it "receives revenues from Illinois" pursuant to the licensing agreement at issue supports personal jurisdiction).

That's what distinguishes this case from *Bray v. Lathem Time Co.*, 2020 WL 1492742 (C.D. Ill. Mar. 27, 2020), which Haemonetics relies upon. There, Lathem (the vendor of the biometric timeclock device used by the plaintiff's employer) "had nothing to do with how the devices got to Illinois;" rather Lathem shipped the devices to Arkansas, and it was "purely happenstance" where the plaintiff's employer ended up using the devices. *Id.* at *3. As such, the only arguable Illinois contact the plaintiff could muster was that Lathem "could reasonably

8

foresee" that the devices would be used in Illinois—without providing any supporting facts to demonstrate as much. *Id.* That is far from the circumstances of this case: Haemonetics knew exactly where in Illinois its biometric-enabled software would be used, knew that—as a result of that use—Haemonetics would store Illinoisans' biometric data, knew that ███████████ ███████████, and as described below, continues to maintain a business relationship with those Illinois Octapharma facilities.

Nor is this case like *Salkauskaite v. Sephora USA, Inc.*, 2020 WL 2796122 (N.D. Ill. May 30, 2020), which Haemonetics cites for the sweeping (and incorrect) conclusion that a defendant's knowledge of where its biometric software is used can never support specific jurisdiction. (Def.'s Br. at 6.) In *Salkauskaite*, the only evidence suggesting that ModiFace (the biometric software provider) knew that its software was being used in Illinois was a Facebook article that ModiFace reposted describing Sephora's use of the biometric technology in Chicago. 2020 WL 2796122, at *5. But the reason ModiFace's knowledge didn't amount to "purposeful availment" in Illinois, the Court found, was because "the article was dated about a year after ModiFace entered its contract with Sephora, and it does not provide evidence that ModiFace … purposefully availed itself of the benefits of doing business in Illinois when it provided software to Sephora." *Id.* Again, that's not the case here: Haemonetics didn't learn about Octapharma's use of its eQue software in Illinois years after the parties contracted; rather, ███████████ ███████████████████████████████████████████████████████████ ███████████████████████████. *Salkauskaite*, like *Bray*, is therefore inapposite.

### D. Haemonetics had a physical presence in Illinois.

In addition to ███████████████████████████████ in Illinois, the terms of the Agreement and its amendments further demonstrate Haemonetics' presence in Illinois. Up until

9

June of 2018—i.e., during the class period of February 4, 2016 to July 30, 2019—Haemonetics required Octapharma to ███████████████████████████████████████ ███████████████████████████████████████. (Ex. 3 at HAE 000164, § 13.3; Ex. 1 at 42:18-44:6 (███████████████████████████ ███████████████ █████████████████████████████████████).) Haemonetics was also required to ███████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████ (Ex. 3 at HAE 000114; Ex. 1 at 48:4–49:24 (reviewing this contract provision and stating that ████████ ███████████████████████).) Haemonetics was also required by the eQue Master Agreement to ██████████████████████████████████████ ████████████. (Ex. 3 at HAE 000112, 117; Ex. 1 at 54:6–22.) *See Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir. 1996) (finding personal jurisdiction where the defendant-manufacturer "conducted dealer training in [the forum state]"); *Liqui-Box Corp. v. Scholle IPN Corp.*, 2020 WL 5593755, at *7 (N.D. Ill. Sept. 18, 2020) (Pallmeyer, J.) (finding jurisdiction appropriate over defendant where defendant made in-person visits to the state and collecting cases).

Defendant will likely point to the Declaration of Alexander Steffan, (dkt. 10-1 at ¶ 8), and assert that Haemonetics does not perform such site visits in Illinois for its donor management software. But while that may *currently* be true for Haemonetics' newer donor management software, NexLynk DMS—which is not at issue here—that doesn't mean it was true for its legacy eQue donor management software that *is* at issue and was phased out of Octapharma

10

facilities on July 30, 2019.[1] (Ex. 9 at HAE 00094; Ex. 1 at 15:3–16:5; 66:4–68:19.) In fact, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (Ex. 1 at 49:1–3.) Rather, he testified that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" (*Id.* at 48:4–49:24.) At this stage of the proceedings, the Court considers those site visits to have occurred. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).

It's no surprise to Plaintiff that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, because she, too, was personally trained by Haemonetics' employees at Octapharma Aurora while working there as a phlebotomist. (Ex. 2 at ¶¶ 2–4.) Ms. Crumpton worked at Octapharma Aurora during the same time period she alleges Haemonetics collected her biometric data without her consent. (*Id.* at ¶ 2.) For two consecutive days while she was working, two field service employees of Haemonetics visited Octapharma Aurora to train Ms. Crumpton and other phlebotomists how to use a new Haemonetics-branded plasma collection device and to train other Octapharma employees how to repair the device if necessary. (*Id.* at ¶¶ 3–4.)

Haemonetics' relationship with Illinois Octapharma facilities doesn't stop there. For example, the company ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (Ex. 1 at

---

[1] Plaintiff scanned her finger at Octapharma Aurora from June 2017 to August 2018, while Octapharma used Haemonetics' eQue software. The NexLynk DMS software, which Octapharma used after August 1, 2019, is not relevant to this case. (*See* Ex. 6 at CRUMPTON-HAE_000305 (stating that Octapharma "utilized Haemonetics' eQue donor management system ("eQue") … through July 30, 2019 and operated Haemonetics' NexLynk donor management system ("NexLynk") … starting after August 1, 2019"); at CRUMPTON-HAE_000309 (stating that "[p]rior to July 30, 2019, when Octapharma used eQue, [donors' fingerprint] information … was electronically transmitted … as a daily upload to Haemonetics' data storage servers" and that after August 1, 2019, when Octapharma used NexLynk, the fingerprint information was no longer transmitted to Haemonetics' servers").)

11

68:17–70:8; *see* Ex. 9 at HAE 000094 (███████████████████

███████████████████).) The company also ███████████████████

███████████████████████████████████████████████████████████

███. (Ex. 1 at 111:14–112:7.) *See Walden*, 571 U.S. at 285 (explaining that "physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact"); *Ford Motor*, 141 S. Ct. at 1028 (finding jurisdiction where Ford "regularly maintain[s] and repair[s] Ford cars" in the forum states and "distributes replacement parts" there).

Haemonetics takes up its own space in Illinois, too. Haemonetics maintained ██████

███████████████████████████████████████████████████████████

███████████████████████. (Ex. 1 at 77:3–78:14; Ex. 8 at HAE 000001.) ██

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████. (Ex. 8 at HAE 000001; Ex. 10 at CRUMPTON-HAE_00217.) Haemonetics also maintained a registered agent in Illinois prior to this lawsuit being filed, and currently maintains one in Illinois. (Ex. 1 at 85:22-87:12; Ex. 11 at HAE 000092–93.)

Haemonetics will likely contend that ███████████ had nothing to do with the eQue software—instead, it will say the ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ But Janet Conneely, Haemonetics' former Vice President and General Manager who ███████████

███████████████ worked at one of Haemonetics' Chicagoland offices, described her role there as "general management responsibilities … for Chicago based businesses including … Haemonetics Software Services (development and marketing of software to blood bank **and plasma industries**)." (Ex. 4 at CRUMPTON-HAE_000220.) ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. At minimum, this evidence creates a dispute of fact regarding whether ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, a dispute that must be resolved in Plaintiff's favor on a Rule 12(b)(2) motion. *Felland*, 682 F.3d at 672.

It's also likely that Haemonetics will take the position that its physical offices in Illinois, or perhaps even its own employees' frequent visits to Illinois, should not be counted because they are not a contact that is "related to" Plaintiff's claim that Haemonetics collected her biometric data in violation of Illinois law. Courts have grappled for years to define the ambiguous concept of what constitutes a sufficiently "related" forum contact. *See uBID*, 623 F.3d at 429 (extensive discussion of relatedness); *Russell v. SNFA*, 2013 IL 113909, ¶ 83 (collecting cases and noting, at the time, that "[a]lthough the United States Supreme Court has not clarified what is meant by 'arising out of' or 'related to' in the context of a jurisdiction question, several courts have determined that the applicable standard is lenient or flexible."). The Supreme Court has now weighed in, to an extent, on the question to reject the contention that a defendant's forum-related contacts must have a causal relationship with the suit. *Ford Motor*, 141 S. Ct. at 1026. Rather, specific jurisdiction requires only a "connection," "affiliation," or "relationship" between the defendant's contacts and the plaintiff's suit. *Id.* This is consistent with

the Seventh Circuit's interpretation in *uBid*: rejecting a causational approach and instead asking whether a defendant's being subject to jurisdiction in an eventual lawsuit is proportional to the "tacit quid pro quo" that the entity entered into when it made the contact at issue with the state. *uBID*, 623 F.3d at 430 ("The precise causal relationship between contacts and claim was not important; what was required was that the relationship be 'intimate enough to keep the quid pro quo proportional and personal jurisdiction reasonably foreseeable.'").

Haemonetics is in the business of providing a variety of different software and hardware to companies that handle blood and plasma collection. One of the things Haemonetics does specifically with regard to its plasma business is train employees and service its products at Illinois locations. One of those products, Plaintiff alleges, collects her and a large class of individuals' biometric data without their consent during the plasma collection process. Haemonetics cannot sliver away this offending part of its suite of plasma products from its extensive contacts that create and maintain the other products and Haemonetics' relationship with Octapharma—all of which are happening in Illinois. *E.g.*, *Russell*, 2013 IL 113909, ¶¶ 1, 5–6, 15, 82, 84 (exercising jurisdiction over the defendant-manufacturer of a helicopter bearing that allegedly caused a helicopter crash where the defendant had no direct contacts with Illinois for *helicopter* bearings, but only contacts with Illinois for its separate business of providing bearings for *fixed-wing aircrafts*); *see also Logan Prods.*, 103 F.3d at 53; *Liqui-Box*, 2020 WL 5593755, at *7. Put another way, the "tacit quid pro quo" that Haemonetics entered into by doing extensive plasma-related business in this state is completely proportional to the fact that it has to answer for part of its plasma-related conduct here.

The cases relied upon by Haemonetics on this point pre-date *Ford Motor*, for one, and are otherwise obviously distinguishable. *Gullen v. Facebook* was a suit brought by a non-user of the

Facebook site to try to hold Facebook accountable for use of its facial recognition algorithm. 2016 WL 245910, at *1 (N.D. Ill. Jan. 21, 2016). There, Facebook's general "sales and advertising" office in the state had no plausible link to Facebook's performing facial recognition on the plaintiff who had never even used Facebook. *Id.* at *2. In contrast, Haemonetics' activities arise from the very same set of services that resulted in Plaintiff's biometric data being collected by Haemonetics.[2] For these reasons, each of Haemonetics' Illinois contacts described above sufficiently relate to Plaintiff's suit for purposes of specific jurisdiction.

## II. It is reasonable to litigate this case in Illinois.

With regard to the third specific jurisdiction factor, Haemonetics does not argue that it would offend "traditional notions of fair play and substantial justice" for it to litigate in Illinois, and for good reason: "it is not unreasonable to ask a defendant who enters a forum state to further a business transaction to return to that state to litigate matters directly related to the defendant's business dealings." *Prevue Pet Prods. v. Targeted Media for Med., Inc.*, 2003 WL 22247182, at *4 (N.D. Ill. Sept. 29, 2003). Because Haemonetics' sale of the eQue donor management software and related suite of plasma products "are inextricably linked to the alleged tortious activity underlying [Plaintiff's] claims[,]" *Curry v. Revolution Labs.*, 949 F.3d 385, 401 (7th Cir. 2020) there is nothing "random, fortuitous, or attenuated" about Haemonetics facing suit in Illinois court. *Burger King*, 471 U.S. at 475 (internal quotation marks and citation omitted).

## CONCLUSION

For all of these reasons, the Court should deny Defendant's Rule 12(b)(2) motion.

---

[2] Plaintiff is, frankly, not sure that *Gullen* is the right result or survives *Ford Motor*. But the Court does not need to agree nor disagree with that opinion to find that Haemonetics' activities meet the "tacit quid pro quo" entered into by Haemonetics as they are far more closely related than Facebook's asserted activities in Illinois.

15

Respectfully submitted,

**MARY CRUMPTON**, individually and on behalf of all others similarly situated,

Date: June 29, 2021

By: /s/ Schuyler Ufkes
    *One of Plaintiff's Attorneys*

Benjamin H. Richman
brichman@edelson.com
J. Eli Wade-Scott
ewadescott@edelson.com
Schuyler Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

David Fish
dfish@fishlawfirm.com
John Kunze
kunze@fishlawfirm.com
THE FISH LAW FIRM, P.C.
200 East Fifth Avenue, Suite 123
Naperville, Illinois 60563
Tel: 630.355.7590
Fax: 630.778.0400